UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------------------------------------------

In re:                                                              Case Number:  09-15224-7

     LEONARD D. BRONK,

              Debtor.

----------------------------------------------------------------

     JOHN M. CIRILLI, TRUSTEE,

              Plaintiff,

     v.                                                               Adversary Number: 10-44

     LEONARD D. BRONK,

              Defendant.

----------------------------------------------------------------------------------------------------

MEMORANDUM DECISION

     The matters pending before the Court are the chapter 7 trustee's objection

to the debtor's exemptions and the adversary proceeding in which the trustee

seeks the denial of the debtor's discharge.  At the final hearing the trustee

represented himself and Jared Redfield appeared on behalf of the debtor.  The

parties stipulated to the facts and submitted both the exemption and

dischargeability issues to the Court for determination.  The Court took the matter

under advisement.  The following constitutes the Court's findings of fact and

conclusions of law pursuant to Fed. R. Bankr. P. 7052.

     One of the most contentious aspects of bankruptcy law is the notion that by

filing for relief debtors are getting away with something.  This impression is only

heightened when a debtor converts non-exempt assets into exempt property on

the eve of bankruptcy in an attempt to protect them from creditors.  Often

innocuously described by debtors as "pre-bankruptcy planning," this transformation

of assets is frequently regarded by others as a shell game, easily manipulated by a

clever operator into a vehicle for fraud.[1]  In this case, the trustee takes exception to

Mr. Bronk's pre-petition efforts to shield approximately $140,000.00 from his

creditors.  Resolution of the dispute requires consideration of not only the

boundaries of permissible bankruptcy planning but also Wisconsin exemption law.

For the reasons which follow, the Court concludes that Mr. Bronk is entitled to a

discharge, but not to all of the exemptions he has claimed.

Mr. Bronk filed bankruptcy on August 5, 2009.  Prior to the filing, he owned

an unencumbered home in Stevens Point, Wisconsin.  In May of 2009, he

borrowed $95,000.00 from Citizens Bank and gave the bank a mortgage on his

home.  He used the mortgage proceeds to fund several EdVest College Savings

Plans, ostensibly for the benefit of his grandchildren.[2]  The debtor also had a

certificate of deposit at Citizens Bank in the amount of $42,000.00.  A few weeks

before the petition date, the debtor converted the CD to an annuity with CM Life

Insurance Company; the annuity was then claimed as exempt on the debtor's

schedule C.  Mr. Bronk admits that prior to the transfers he had incurred

---

[1] As one treatise observes, "The transfer of assets on the eve of bankruptcy is a
lightning rod for intense scrutiny."  See Keith M. Lundin & William H. Brown, Chapter 13
Bankruptcy 4th ed. § 181.1 at ¶ 1, sec. rev. June 7, 2004, www.ch13online.com.

[2] These accounts were listed on schedule B of the debtor's bankruptcy petition, and
included accounts for the benefit of Alyssa Bronk ($24,124.77), Brandy Alexandria Marie Bronk
($19,697.48), Colton James Bronk ($19,689.44), Kelly Leigh Bronk ($19,697.48), and Megan
Marie Bronk ($19,583.73).  As the trustee notes, the debtor did not receive any consideration for
these transfers and retains control over the funds.

substantial debts relating to his wife's medical care.[3]  He performed these

transactions on the advice of an attorney, who told Mr. Bronk that they would

accomplish his goal of defraying the educational expenses of his grandchildren

while allowing him to remain in his own home.  According to the trustee, these

transfers effectively converted all of the debtor's non-exempt assets to exempt

ones, leaving nothing for his creditors.

The trustee has objected to the debtor's exemptions and has also sought to

deny the debtor's discharge on the theory that the debtor's pre-filing conduct

strayed into that murky realm where overly aggressive asset protection only serves

to hinder, delay, or defraud creditors, fresh starts become head starts, and pigs are

safe but hogs are slaughtered.[4]  The trustee also objected to the specific

exemption claims, and contends that even if the debtor did not engage in

excessive (or fraudulent) bankruptcy planning, the exemptions should still be

denied because the assets do not fit within the confines of the relevant statutory

provisions.

---

[3] Apparently, an error in his wife's health insurance enrollment meant that many of the expenses incurred prior to her death in 2007 were not covered by insurance.  Mr. Bronk himself suffered a stroke in early 2009 after a lengthy battle with the insurance company over these expenses.

[4] As one court rather famously observed, "There is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered."  In re Zouhar, 10 B.R. 154, 157 (Bankr. D.N.M. 1981) (citing Dolese v. United States, 605 F.2d 1146, 1154 (10th Cir. 1979)). This imprecise rhetoric serves as a template for the notion that while debtors are entitled to "some" exemption planning, "a wholesale sheltering of assets which otherwise would go to creditors is not permissible."  Zouhar, 10 B.R. at 157; see also In re Krantz, 97 B.R. 514, 525 (Bankr. N.D. Iowa 1989) ("While there will be times when this Court cannot tell the difference between a pig and a hog, this is not one of those times.").

Certain basic principles are applicable to these determinations.  The purpose of the bankruptcy code is to provide an equitable distribution of a debtor's assets to creditors and to relieve the "honest debtor" from the weight of oppressive indebtedness.  Village of San Jose v. McWilliams, 284 F.3d 785, 790 (7th Cir. 2002) (citing Williams v. United States Fidelity & Guaranty Co., 236 U.S. 549, 554-55, 35 S. Ct. 289, 59 L. Ed. 713 (1915)).  Courts construe the bankruptcy code liberally in favor of the debtor and strictly against the creditor.  McWilliams, 284 F.3d at 790 (citing Gullickson v. Brown (In re Brown), 108 F.3d 1290, 1292 (10th Cir. 1997)); In re Scarlata, 979 F.2d 521, 524 (7th Cir. 1992); see also In re Johnson, 98 B.R. 359, 367 (Bankr. N.D. Ill. 1988) ("The denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor.").  Consequently, the protection of the bankruptcy code's "fresh start" policy can only be denied a debtor who is something less than honest in dealing with creditors or the court.  Grogan v. Garner, 498 U.S. 279, 286-87, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991) (the opportunity for a fresh start is limited to the "honest but unfortunate" debtor).  And finally, the party objecting to the discharge bears the burden of proof.  Kolodziej v. Reines (In re Reines), 142 F.3d 970, 973 (7th Cir. 1998).

## I.  Hindering, Delaying, or Defrauding Creditors

The first issue for consideration is something of a two-for-one deal:  i.e., whether the debtor's discharge should be denied and his exemptions disallowed because he transferred property with the intent to hinder, delay, or defraud creditors.  In order to succeed on an objection to discharge under 11 U.S.C. § 727(a)(2)(A), the trustee must prove, by a preponderance of the evidence, that

4

the debtor's actions occurred in the year prior to the bankruptcy filing, that the act
(or acts) in question consisted of transferring, removing, destroying, or concealing
the debtor's property, and that the debtor acted with the intent to hinder, delay, or
defraud creditors.  In re Smiley, 864 F.2d 562, 565 (7th Cir. 1989); Lee Supply
Corp. v. Agnew (In the Matter of Agnew), 818 F.2d 1284, 1287 (7th Cir. 1987).
Likewise, under Wis. Stat. § 815.18(10), an exemption may be denied if the court
finds that the debtor "procured, concealed, or transferred assets with the intention
of defrauding creditors."  See In re Vangen, 334 B.R. 241, 246 (Bankr. W.D. Wis.
2005); In re Przybylski, 340 B.R. 624 (Bankr. E.D. Wis. 2006).

Under § 522(b) of the bankruptcy code, a debtor "can choose to exempt
from property of the bankruptcy estate that property which is exempt under the
applicable state or federal law."  Sholdan v. Dietz, 108 F.3d 886, 888 (8th Cir.
1997).  Here, Mr. Bronk has claimed a variety of exemptions under Wisconsin law.
In dispute are the exemption of the college savings plans under Wis. Stat.
§ 815.18(3)(p) and the annuity under Wis. Stat. § 815.18(3)(j).[5]  Mr Bronk
concedes that the pre-petition transfers occurred solely so that he could make
these claims.  While he did not give the money to a neighbor or hide it in his
basement, the conversion of non-exempt property to exempt property can qualify
as a "transfer" within the meaning of § 727(a)(2).  Smiley, 864 F.2d at 565-66.[6]

---

[5] Mr. Bronk's schedule C indicates that he also claimed an exemption under
§ 815.18(3)(j) for an IRA in the amount of $32,438.21.  The trustee does not object to this
exemption.

[6] As the code provides, a "transfer" is "each mode, direct or indirect, absolute or
conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest
in property."  11 U.S.C. § 101(54)(D).

There is also no argument that the transfers occurred within the year prior to the petition.  Since the parties have acknowledged these facts, the only remaining dispute centers around Mr. Bronk's intent.  In that regard, there must be evidence of more than simply the transfer itself; there must be proof that the conversion of assets was part of Mr. Bronk's scheme to hinder, delay, or defraud creditors.

As the Seventh Circuit observed in Smiley, "Conversions of assets from non-exempt to exempt forms within the year preceding a petition for bankruptcy are not necessarily fraudulent to creditors."  864 F.2d at 566.[7]   Since direct evidence of fraudulent intent is rarely available, courts frequently refer to the "badges of fraud" to determine whether a debtor acted with the requisite intent.  Addison v. Seaver (In re Addison), 540 F.3d 805, 811 (8th Cir. 2008); see also McWilliams, 284 F.3d at 790 (intent to defraud must be actual and cannot be constructive, but because it is "unlikely" the debtor will admit fraud, intent may be established by circumstantial evidence).  As the parties noted in their arguments, courts have identified a number of factors that may be consulted in making this determination.  Before proceeding further, however, two points should be made.

First, many of the relevant authorities deal with an objection to discharge or an objection to exemptions, but not necessarily both.  Regardless, the same basic standard is applicable to denial of either an exemption or the discharge.  As noted by the Eighth Circuit:

---

[7]  The legislative history of the bankruptcy code reflects congressional intent to allow debtors to convert non-exempt property into exempt property, and the House and Senate reports specifically provide: "The practice is not fraudulent as to creditors, and permits the debtor to make the full use of the exemptions to which he is entitled under the law."  H.R. Rep. No. 95-595 at 361 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6317; S. Rep. No. 95-989, at 76 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5862.

> [T]he standard applied consistently by the courts [in discharge
> objection cases] is the same as that used to determine whether an
> exemption is permissible, i.e., absent extrinsic evidence of fraud,
> mere conversion of non-exempt property to exempt property is not
> fraudulent as to creditors even if the motivation behind the conversion
> is to place those assets beyond the reach of creditors.

Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871, 874 (8th Cir. 1988).  While

the Seventh Circuit's decision in Smiley involved a question of discharge,

Wisconsin bankruptcy courts have generally recognized that the same factors

apply in the context of an objection to exemptions under Wis. Stat. § 815.18(10).

For example, in In re Bogue, 240 B.R. 742, 750 (Bankr. E.D. Wis. 1999), the court

stated that "Smiley dealt with the issue of whether such conduct on the part of the

debtors gives rise to a basis for denial of discharge, but that same reasoning

applies on the issue of exemption disallowance."  See also Przybylski, 340 B.R. at

629-30 (while the case involved an exemption dispute rather than a question of

discharge, "[t]he test is the same").

The second point to be made concerns the factors themselves, and the

court's consideration of the amount of the claimed exemption.  When considering

whether to grant a discharge and allow a debtor to leave many obligations unpaid,

the temptation is to place considerable weight on the amount of money a debtor

hopes to shield from creditors.  This sentiment manifests itself in a variety of

characterizations, whether it be the slaughtered hog of Zouhar or merely the "smell

test" mentioned by the bankruptcy court in In re Johnson, 80 B.R. 953, 961-62 n.9

(Bankr. D. Minn. 1987).[8]  As one court observed in the context of an affluent debtor

who sought to utilize the unlimited homestead exemption allowed under Texas law:

> It would constitute a perversion of the purposes of the Bankruptcy
> Code to permit a debtor earning $180,000 a year to convert every one
> of his major nonexempt assets into sheltered property on the eve of
> bankruptcy with actual intent to defraud his creditors and then emerge
> washed clean of future obligation by carefully concocted immersion in
> bankruptcy waters.

First Tex. Sav. Ass'n v. Reed (In re Reed), 700 F.2d 986, 992 (5th Cir. 1983).

Consideration of the value of the assets converted often seems like an appropriate

response to these concerns.  See Tveten, 848 F.2d at 876 (debtor sought to utilize

an unlimited state exemption with "the potential for unlimited abuse," and

converted roughly $700,000.00 of non-exempt assets into exempt ones); In re

Carey, 938 F.2d 1073, 1077 (10th Cir. 1991) (courts may also consider the

monetary value of the assets converted).

    Notably, however, Smiley rejected the Zouhar court's conclusion that the

size of the exemption claim was itself evidence of fraud.  See 864 F.2d at 567 n.3

(the court rejected inclusion of "an unusually large amount of property . . . claimed

as exempt" among the factors to consider).  Instead, the court agreed with those

decisions that "disregard[ed] both the actual amount claimed as exempt and any

---

[8] Although the Johnson court did articulate the inherent challenge associated with either
approach:

> Animal husbandry at least furnishes weight and age tests to divide "pigs" from
> "hogs"; the use of a "smell" test, while of some utility in the most extreme
> (presumably to be read "most odious") cases, would be so subject to the pitfalls
> of subjectivity as to have no paradigmatic value at all.  Everyone's nose, after all,
> is different.

80 B.R. at 962 n.9.

evidence that the debtor is motivated by a desire to shield assets" and only denied a debtor's discharge "where the debtor has committed some act *extrinsic to the conversion* which hinders, delays, or defrauds." Id. at 567 (emphasis added).  In this regard, it must be remembered that the denial of a debtor's discharge is a harsh remedy.  Pleguar Corp. v. Reilly (In re Reilly), 417 B.R. 107, 112 (Bankr. E.D. Wis. 2009); Fiala v. Lindemann (In re Lindemann), 375 B.R. 450, 464 (Bankr. N.D. Ill. 2007).  Assuring that the debtor had the actual intent to hinder, delay, or defraud creditors furthers the purpose of affording relief to the "honest debtor." McWilliams, 284 F.3d at 790.

Smiley cautioned that courts should not prohibit "a debtor's full use of exemptions within the limits of the law," and concluded that it is irrelevant that the debtor stands to gain even "a large amount" if the claimed exemption is upheld. 864 F.2d at 567.  Notwithstanding Smiley's disregard of the "actual amount claimed as exempt," the size of the claimed exemptions has often been noted as a factor worth considering.  See Bogue, 240 B.R. at 750 (the court listed the "amount of exemption" among a non-exclusive list of factors the court might consider); Przybylski, 340 B.R. at 630 (the court observed that approximately $150,000.00 was at issue, "far more" than the amount "deemed reasonable" in Bogue).  This Court has been reluctant to regard the amount claimed exempt as much more than a footnote, at least as long as the claim falls within the limits established by the Wisconsin legislature.[9]  For example, several years ago this Court considered

---

[9] Indeed, the amount - or value - of assets transferred by the debtor would appear far more relevant as circumstantial evidence of fraudulent intent in a situation in which the debtor
(continued...)

whether a debtor's exemption of various retirement-related annuities should be denied on the grounds that her pre-petition transfers of non-exempt funds into the annuities violated Wis. Stat. § 815.18(10). <u>See</u> <u>Vangen</u>, 334 B.R. at 241. Since the creditor did not provide evidence of any behavior of the debtor *in addition to* the alteration of the non-exempt nature of the assets, the exemption was allowed despite the fact that she sought to exempt over $130,000.00. <u>Id.</u> at 248-49.[10]

This approach is consistent with <u>Smiley</u>'s analysis of whether pre-bankruptcy planning imperils a debtor's discharge, as the Seventh Circuit agreed with the line of authority which looked for "some act *extrinsic to the conversion* which hinders, delays or defrauds." 864 F.2d at 567. The court indicated that such "extrinsic signs of fraud" might include:

> (1) that the debtor obtained credit in order to purchase exempt property; (2) that the conversion occurred after the entry of a large judgment against the debtor; (3) that the debtor had engaged in a pattern of sharp dealing prior to bankruptcy; . . . and (4) that the conversion rendered the debtor insolvent.

---

[9](...continued)
actually transferred property to another person, rather than simply transformed non-exempt assets into exempt ones. At least in the latter context, debtors are not to be prohibited from the "full use of exemptions within the limits of the law." <u>Smiley</u>, 864 F.2d at 567. This means debtors cannot be penalized for ordering their affairs in such a manner as to take best advantage of the exemptions legally afforded to them. <u>Vangen</u>, 334 B.R. at 245; <u>see also</u> <u>In re Bruski</u>, 226 B.R. 422, 425 (Bankr. W.D. Wis. 1998). Placing limitations on exemptions is the province of the legislature, not the court system. <u>See</u> <u>In re Johnson</u>, 880 F.2d 78, 83 (8th Cir. 1989) ("Ultimately, fixed dollar limits on the use of exemptions must be set by legislatures."). As Judge Learned Hand observed in a similar context, "[T]here is nothing sinister in so arranging one's affairs as to keep taxes as low as possible." <u>Commissioner v. Newman</u>, 159 F.2d 848, 850-51 (2d Cir. 1947).

[10] In <u>Vangen</u>, the debtor mortgaged her home (much like Mr. Bronk) and sold an interest in a commercial building. The creditor contended that she had "drained" the non-exempt equity from her assets, but all that was proven was that the debtor had sought to take "full use" of the available exemptions. 334 B.R. at 245.

Id. (citing 4 Collier on Bankruptcy ¶ 727.02[3] at 19-20 (15th ed. 1986).  Admittedly,

this is a non-exclusive list, and other factors can be examined.  In Bogue, the court

considered additional factors such as the proximity of the conversion to the filing

date, the source of the funds, whether the debtor attempted to mislead creditors

during the conversion, the purpose of the conversion, and whether the

conveyances were for less than fair consideration.  240 B.R. at 750-51; see also

Przybylski, 340 B.R. at 630-31 (utilizing the same factors).  The key, however, is

that under Smiley the court's task is not to evaluate the relative reasonableness of

the exemption claim, but rather to ascertain whether the surrounding

circumstances illustrate some sort of fraud or deception on the part of the debtor.[11]

The trustee also cites the factors outlined in McWilliams as relevant to the

determination of "actual intent" under § 727(a)(2), even though that case involved the

transfer of property to third parties rather than the exemption planning at issue here.

The McWilliams factors (often included among lists of the so-called "badges of fraud")

are the following:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or
> close associate relationship between the parties; (3) the retention of
> possession, benefit or use of the property in question; (4) the financial

---

[11] A review of the Wisconsin exemption statute reveals that the state legislature is fully
capable of providing caps on exemption claims in order to curb possible abuse. Article I, Section
17 of the Wisconsin Constitution authorizes exemption laws and provides that "[t]he privilege of
the debtor to enjoy the necessary comforts of life shall be recognized by wholesome laws,
exempting a reasonable amount of property from seizure or sale for the payment of any debt or
liability hereafter contracted."  The legislature has determined that it is reasonable to permit a
debtor a $5,000.00 exemption in depository accounts, a $75,000.00 exemption in a homestead,
and an unlimited exemption in some items, including certain retirement benefits, even though
other provisions are limited to amounts "reasonably necessary for the support of the debtor and
the debtor's dependents." See Wis. Stat. §§ 815.20 and 815.18(3)(i), (j), and (k) for
comparison. Making full use of these exemptions is not fraudulent, but it is possible for a court
to find that a debtor engaged in inappropriate behavior in order to claim them.

condition of the party sought to be charged both before and after the
transaction in question; (5) the existence or cumulative effect of the
pattern or series of transactions or course of conduct after the incurring of
debt, onset of financial difficulties, or pendency or threat of suits by
creditors; and (6) the general chronology of the events and transactions
under inquiry.

284 F.3d at 791 (citing In re Chastant, 873 F.2d 89, 91 (5th Cir. 1989)).  In McWilliams,

consideration of these factors illustrated that the debtors "attempted to create the

appearance that they no longer owned the property."  284 F.3d at 794.  Likewise, in

Smiley the debtor actively worked to hide the conversion of assets from his creditors.

For example, he purchased exempt property the day before he met with his creditors to

discuss his financial situation, and at that meeting he misrepresented the value of his

non-exempt assets, even though he had already encumbered those assets in order to

acquire property that could qualify for an exemption.  864 F.2d 568.  Such conduct is

clearly "extrinsic" to the conversion itself, and properly regarded as fraudulent to

creditors.

        The question is whether the trustee in this case has proffered sufficient evidence

of conduct that goes beyond the simple act of converting (or transforming) non-exempt

assets to exempt ones.  In this regard, the trustee contends that consideration of the

various factors is unnecessary because the debtor admitted his wrongful conduct and

conceded that he attempted to create exempt assets on the advice of his prior

bankruptcy counsel.  The trustee notes that a debtor who admits to transferring property

with the intent of placing it beyond the reach of his creditors has essentially admitted to

conduct which violates § 727(a)(2)(A), and there is no need to rely upon

circumstantial evidence or inferences in determining whether he acted with the

requisite intent.  See In re Adeeb, 787 F.2d 1339, 1343 (9th Cir. 1986).

Adeeb, however, involved a debtor who was allegedly advised by an

attorney to transfer the title of some of his real estate for no consideration to "third

parties who could be trusted." Id. at 1341.  While the court noted that, in general, a

debtor who relies upon the advice of his attorney lacks the intent required to deny

him a discharge of his debts, "the debtor's reliance [on the advice] must be in good

faith." Id. at 1343.  Both the debtor and the attorney knew that the purpose of

these transfers was to hinder or delay creditors, and the debtor was not entitled to

rely upon a defense that he relied in good faith on the advice of an attorney. Id.

The bankruptcy court found that the debtor transferred the real property out of his

estate with the actual intent to hinder or delay a creditor.  Much like the debtor in

the Seventh Circuit's McWilliams decision, the debtor in Adeeb attempted to create

the illusion that he no longer owned the property.  On appeal, the Ninth Circuit

affirmed, finding that he "knowingly" acted to hinder or delay creditors. Id.

Put simply, the debtor in Adeeb had no legitimate purpose for the transfers

other than to hinder, delay, or defraud creditors; he was manufacturing fictional

transactions to create a smokescreen that would make it difficult for his creditors to

collect upon their claims.[12]  Mr. Bronk, on the other hand, was attempting to take

advantage of legally available exemptions.  The Seventh Circuit has indicated that

in this context, "evidence that the debtor is motivated by a desire to shield assets"

---

[12] The debtor in Adeeb did attempt to "cure" his conduct by recovering the assets himself
and disclosing the transactions in his bankruptcy case.  The Ninth Circuit found such
redemptive behavior might absolve a debtor and permit issuance of a discharge.  The Seventh
Circuit, however, rejected this idea in McWilliams.  See 284 F.3d at 792 ("This reasoning is not
persuasive because the debtor was in fact dishonest, he tried to hide assets from creditors, and
only after the debtor discovered he would likely be caught and pay a penalty did he reverse the
transfers.").

will not transform exemption planning into fraudulent conduct.  Smiley, 864 F.2d at

567.  For example, Smiley's knowledge of exemption law was "irrelevant."  Id.

Likewise, Mr. Bronk has not conceded that he engaged in fraudulent conduct.  He

merely acknowledged that he engaged in exemption planning upon the advice of

his attorney.

On its own, the desire to protect assets in a legitimate way (i.e., through the

use of properly claimed exemptions) is simply not evidence of fraudulent intent.  In

one recent case, the Ninth Circuit concluded that a debtor's conversion of a non-

exempt individual retirement account into a pension fund on the eve of bankruptcy

did not constitute a fraudulent transfer, even though the net effect was that the

debtor realized an exemption of almost $1.4 million.  See Gill v. Stern (In re Stern),

345 F.3d 1036 (9th Cir. 2003).  According to the court, the "principal evidentiary

inference" the trustee relied upon was the fact that non-exempt assets were

converted to exempt assets immediately prior to the filing, but this inference was

"insufficient as a matter of law to establish a fraudulent transfer."  Id. at 1044.  The

facts indicated that the debtor had been sued in arbitration (and lost) prior to the

transfer, that the transfer was for the benefit of the debtor and his wife, that the

transfer was of substantially all of his assets, and that he retained control over the

funds following the transfer.  The court dismissed these alleged badges of fraud by

saying they were "simply restatements of the accusation that [the debtor]

14

converted nonexempt assets into exempt assets, an accusation that cannot

support a finding of fraud." Id. at 1045.[13]

Another instructive case is Murphey v. Crater (In re Crater), 286 B.R. 756

(Bankr. D. Ariz. 2002), in which the debtors used the proceeds from the sale of

non-exempt stock to pay down the second mortgage on their home, thereby

increasing their homestead exemption.  They filed bankruptcy less than three

weeks later, and a creditor objected to their discharge.  The Crater court noted the

general rule that pre-bankruptcy planning is permissible absent proof of extrinsic

fraud.  In considering the badges of fraud, the court organized them into three

categories – those which themselves indicate fraudulent or deceptive intent; those

which do not implicitly suggest fraud but do suggest there may have been a hidden

motivation because the action was not "an economically rational decision" unless it

was performed to hinder or delay creditors; and finally, those which may be

innocent in themselves, or are "merely timing factors that become suspicious only

when combined with other factors."  Id. at 764.  As the court observed:

> If conversion of nonexempt into exempt assets should not itself result
> in denial of discharge, should it do so when it occurs shortly after the
> debtor has been sued or incurred a large debt, or is insolvent, or is
> about to file bankruptcy?  If that were the rule, it would mean that
> prospective debtors could engage in exemption planning only up until
> the point where it appeared they might need to do so . . . .  [T]his
> would be to add a restriction to the exemption that the legislature (and
> Congress) did not impose, i.e., certain assets are exempt only if
> purchased while solvent, while not owing substantial debts, or some
> significant period of time prior to levy of execution or bankruptcy.

---

[13] Admittedly, Stern was not a "simple instance" of eve-of-bankruptcy planning, as at
least a portion of the transferred funds might have been exempt anyway.  See Wolkowitz v.
Beverly (In re Beverly), 374 B.R. 221, 240-41 (B.A.P. 9th Cir. 2007).  Nonetheless, Stern still
illustrates that the amount shielded should be of minor significance in the overall context of the
debtor's exemption planning.

Id. at 765.

Indeed, it is unlikely that *any* transformation of non-exempt assets would be regarded as fair or just by creditors, especially when it reduces their prospects of repayment.  However, Congress envisioned that debtors would be allowed to make "full use" of available exemptions, and it would be impossible for a debtor to do so without some level of planning or an intent to preserve assets at the expense of creditors.[14]  What elevates exemption planning into an offense under § 727(a)(2) is the "extrinsic" conduct – the other things the debtor may have done.  Or as another court observed:

> The upshot is clear, and not particularly surprising.  Facts matter.  The prebankruptcy conversion of non-exempt assets to exempt assets is not per se fraudulent, but neither is it per se proper and insulated from scrutiny and possible avoidance.  There is no absolute safe harbor for bankruptcy exemption planning.

Gugino v. Orlando (In re Ganier), 403 B.R. 79, 85 (Bankr. D. Idaho 2009).  In Smiley, for example, the debtor misrepresented the value of certain assets and managed to forestall creditors from filing an involuntary petition against him; the delay afforded by these tactics allowed him to establish residency in Kansas and claim the Kansas homestead exemption.  In denying his discharge, the court also noted other factors, including the use of credit to purchase the exempt property, the recent entry of a large judgment, the debtor's pattern of "sharp dealing," and

---

[14] As the Crater court observed, disallowance of an exemption simply because the debtor sought to protect assets "would be contrary to the very purpose of providing exemptions, and because the ability to make intelligent use of the exemptions was specifically addressed and permitted" in the bankruptcy code.  286 B.R. at 761.

16

the fact that the conversion rendered the debtor effectively insolvent.  864 F.2d at

568-69.[15]

A review of other cases, including those cited by the trustee, also indicates

that debtors normally "lose" (either their discharge or their exemption claim) only

when they do more than simply engage in pre-bankruptcy planning.  For example,

in In re McNamara, 89 B.R. 648 (Bankr. N.D. Ohio 1988), the debtor admitted that

he kept approximately $70,000.00 in his closet in order to keep it away from

creditors.  He gave the money to relatives to purchase a house for him because he

knew he could not put it in his name.  The court found that he had concealed

assets and acted with the requisite intent under § 727(a)(2)(A).  Id. at 652.[16]  In

Reese v. Kulwin (In re Kulwin), 187 B.R. 341 (Bankr. D. Kan. 1995), the debtor's

pre-petition planning appears to have been targeted at a specific creditor (a father-

in-law whom the debtor intended would never be repaid).  In Bernard v. Sheaffer

(In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996), the debtor had specific

knowledge that the creditor was seeking a "temporary protective order" preventing

---

[15] Intriguingly, the Seventh Circuit indicated that it was still not clear that Smiley intended
to *defraud* his creditors.  864 F.2d at 568.  Nonetheless, he had "every incentive" to delay them,
and his conduct warranted the denial of his discharge because it was clear that he actively
intended to hinder or delay creditors.  Id.  Despite this reservation, the court indicated that the
relevant inquiry under § 727(a)(2) is to look for "extrinsic signs of *fraud*," id. at 567 (emphasis
added), and the record in Smiley contained several identifiable "signs" that justified the denial of
the debtor's discharge.  These statements may raise some theoretic debate about the
severability of the "hinder, delay, or defraud" components of § 727(a)(2), as some courts regard
the phrase as a "single test."  See Addison, 540 F.3d at 812 (citing In re Johnson, 880 F.2d 78,
80 n.1 (8th Cir. 1989)).  As a practical matter, however, in this context it is enough to know that
the debtor must have done *something* in addition to altering the nature of the assets, and that
conduct must justify a finding that the debtor improperly intended to forestall creditors from
realizing on their claims.

[16] Much like the debtors in McWilliams, whose transfers were designed "to create the
appearance that they no longer owned the property."  284 F.3d at 794.

17

him from making transfers other than in the ordinary course of business, and the

debtor acknowledged that his withdrawals from a money market account were

designed to evade attachment.  In <u>Cadle Co. v. Stasch (In re Stasch)</u>, No. 05-

20789, Adv. 05-2103, 2008 WL 877209, at *2 (Bankr. S.D. Fla 2008), the debtor

concealed and failed to disclose assets, including funds which were transferred

and held in a bank account in another person's name.  In <u>Reed</u>, the Fifth Circuit

was not only troubled by the size of the debtor's exemption claim but by the "rapid

conversion of nonexempt assets" that occurred only *after* he "arrang[ed] with his

creditors to be free from payment obligations until the following year." 700 F.2d at

991.[17]  In <u>Beverly</u>, the debtor deliberately structured his divorce settlement to

prevent a creditor from realizing on a malpractice judgment (he transferred non-

exempt assets to his ex-wife in exchange for her interest in his pension, all part of

his stated scheme to make money "disappear as fast as we can").  <u>See</u> 374 B.R. at

237.

In the present case, Mr. Bronk has acknowledged that he attempted to place

his non-exempt assets – the equity in his home and the money in a bank account –

into forms which might be claimed as exempt and protected from creditors in a

---

[17] In one of the cases cited by the trustee, in the context of 11 U.S.C. § 522(o) (relating to the reduction of a homestead exemption) the debtors were found to have acted with the intent to "hinder, delay, and defraud" creditors when they sold non-exempt assets and applied the proceeds to their homestead.  <u>See</u> <u>In re Lacounte</u>, 342 B.R. 809, 815 (Bankr. D. Mont. 2005). The case appears contrary to <u>Smiley</u>'s expectation that conversion of non-exempt assets into exempt ones will only be considered fraudulent if there is evidence of "extrinsic signs" of fraud. Likewise, the Eighth Circuit's decision in <u>Tveten</u>, which denied the debtor's discharge largely on the basis that the debtor appeared to have abused an exemption by converting nearly his entire net worth into exempt property, must be distinguished to the extent it is inconsistent with the Seventh Circuit's ruling in <u>Smiley</u>.  864 F.2d 567 n.1 (the court characterized <u>Tveten</u> as among those decisions which expect the bankruptcy court to set a limit on the assets a debtor may shield in bankruptcy, a position the Seventh Circuit subsequently rejected).

bankruptcy proceeding.  He did so on the advice of his attorney.  The trustee has

not identified any negotiations with creditors in which the debtor misrepresented

his assets or his intentions in order to forestall creditors from pursuing their

claims.[18]  The proximity of the conversion to the filing appears to have more to do

with a desire to end the insurance dispute and Mr. Bronk's poor health than with a

desperate bid to exempt assets before a creditor might seize them.  While Mr.

Bronk did borrow against his homestead to fund the college savings accounts,

there is no evidence of the sort of tangled lending arrangements which might

suggest fraudulent intent.  See Bogue, 240 B.R. at 751 (in allowing an exemption,

the court noted that "[t]his is not a case of debtors borrowing money to purchase

exempt property and then selling the assets and using the sale proceeds to

acquire exempt annuities" or "a case of debtors obtaining funds by theft and then

converting the funds into exempt property").

There is no evidence of a "pattern of sharp dealing" prior to bankruptcy.  See

Smiley, 864 F.2d at 567.  Clearly, debtors who engage in pre-bankruptcy planning

need to be scrupulous in dealing with creditors.  Misrepresentation of facts or other

clandestine activities are the sort of extrinsic conduct that can lead to the denial of

discharge.  But if Mr. Bronk engaged in any such underhanded tactics, the

evidence has not been presented to the Court.  The debtor simply hoped to

---

[18] In his brief, the debtor notes that his creditors had not obtained judgments against
him.  However, the debtor's statement of financial affairs indicates that a hospital did obtain a
monetary judgment against him in Portage County in a case styled St. Michael's Hospital v.
Leonard Bronk, Case No. 09-CV-95.  The debtor's schedule F indicates the hospital was owed
approximately $230,000.00.  Nonetheless, the trustee does not offer any evidence that the
debtor attempted to hinder or delay this creditor's pursuit of his assets while he attempted to
protect them from seizure by utilizing the exemptions available to him under Wisconsin law.

preserve the equity in his home for the benefit of his grandchildren and a relatively

modest amount of money (the $42,000.00 held in a certificate of deposit).[19]  The

equity in his home was used to fund the college savings accounts, purportedly

because he had hoped to assist his grandchildren with their educational expenses.

The purpose and reasoning behind the conversion is understandable and hardly

deserves to be labeled "fraudulent."[20]

        The protection of the bankruptcy code and the benefit of the discharge are

reserved for the "honest but unfortunate debtor."  Grogan v. Garner, 498 U.S. 279,

286-87, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).  In fact, Congress determined

that "preventing fraud is more important than letting defrauders start over with a

clean slate," and that decision must be respected.  Mayer v. Spanel Int'l, 51 F.3d

670, 674 (7th Cir. 1995).  But it is also true that the denial of a debtor's discharge is

an extreme remedy.  Johnson, 98 B.R. at 367.   Mr. Bronk did not attempt to hide or

conceal anything from his creditors.  He is an elderly man who had hoped to

preserve a few assets after the death of his wife and the insurance snafu that left

him with mounting medical bills.  After a review of the evidence, the Court must

---

        [19] To the extent the amount or value of the assets converted into exempt property is
relevant, the Court finds it relatively modest and in keeping with the debtor's legitimate desire to
preserve his assets within the boundaries of the Wisconsin exemption laws.  It does not indicate
that he sought to defraud his creditors.

        [20] Further, while these transfers may have transformed virtually all of Mr. Bronk's non-
exempt assets into exempt ones, he hardly resembles the affluent debtors of Tveten or Reed,
nor does he have a sizeable income in addition to these assets.  According to his statement of
financial affairs, his 2007 income of $81,589.00 included social security of $26,022.00 and
pension distributions of $55,567.00; his 2008 income of $27,699.00 included social security of
$22,905 and pension distributions of $4,794.00.  Through the date of filing in August of 2009,
his 2009 income totaled $13,846.00 (social security of $10,626.00 and pension distributions of
$3,220.00).

20

conclude that there is not enough proof that Mr. Bronk transferred assets with the

intent to hinder, delay, or defraud creditors.  Consequently, he is entitled to a

discharge and his exemption claims will not be denied under Wis. Stat.

§ 815.18(10).

## II. Exemption of College Savings Accounts

Even though Mr. Bronk did not hinder, delay, or defraud his creditors, his

exemption claims themselves must still be scrutinized because the trustee

contends that they fail to meet the requirements of the statute.  The Court will

begin with the college savings accounts.  Wis. Stat. § 815.18(3) provides that

certain specified property is exempt from the claims of creditors.  Among the items

delineated in the statute is "[a]n interest in a college savings account under

s. 14.64."  See Wis. Stat. § 815.18(3)(p).  Meanwhile, Wis. Stat. § 14.64(7)(a)

provides that "[a] beneficiary's right to qualified withdrawals under this section is

not subject to garnishment, attachment, execution or other process of law."  The

debtor argues that this provision "adds" to the exemption found in Wis. Stat.

§ 815.18(3)(p), rather than limits it.  The trustee contends that these provisions,

taken together, compel the conclusion that *only* a beneficiary's right (or interest) in

a college savings account is subject to exemption.  The corollary of this

suggestion, of course, is that Mr. Bronk may not claim an exemption and that the

trustee is entitled to the funds.

The starting point for statutory construction is the language of the statute

itself.  Where the statute is unambiguous, the court's inquiry is complete; it must

enforce the statute in accordance with its terms.  See Connecticut Nat'l Bank v.

Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992)  ("We

have stated time and again that courts must presume that a legislature says in a

statute what it means and means in a statute what it says there."); Ross-Tousey v.

Neary (In re Ross-Tousey), 549 F.3d 1148, 1157 (7th Cir. 2008) ("When the

language is plain, the sole function of the courts is to enforce the statute according

to its terms.").  The question, in situations like the present case, is whether the

statutes do, in fact, plainly say what they mean.  This appears to be a matter of first

impression, and the Court finds that the language of the statute could be parsed to

favor either party.  The debtor wishes the Court to focus simply on the idea that "an

interest" (or *any* interest) in a college savings fund may be claimed as exempt, and

that as the "account owner" Mr. Bronk surely must be regarded as having an

"interest" in the account.  The trustee wishes the Court to view the exemption as

only covering those interests in an account "under" Wis. Stat. § 14.64 (i.e., only

those interests recognized as exempt under that statute).  He argues that

§ 14.64(7)(a) (which clearly exempts only "a beneficiary's right" to withdrawals)

would be superfluous if the debtor's interpretation of the statute was correct.

        In order to reach a conclusion, it is helpful to consider the history of college

savings accounts – or "529 plans," as they are often called.   In order to encourage

families to save money to pay for college, Congress added provisions to the

Internal Revenue Code which enabled states to create what are called "Qualified

Tuition Programs."  See 26 U.S.C. § 529.  These programs come in two flavors:

the prepaid tuition plan and the education savings plan.  The prepaid option allows

someone to purchase tuition credits on behalf of a beneficiary and essentially "lock

Case 1-10-00044-cjf   Doc 14   Filed 01/07/11   Entered 01/07/11 11:33:47   Desc Main
Document    Page 23 of 37

in" tuition at the current rate.  The savings account option, on the other hand,

allows contributors to make contributions to an account established for a

"designated beneficiary."[21]  The deposited money may then be placed in a variety

of investment options or portfolios, and all earnings are exempt from income tax

while invested in the account.  The earnings avoid tax entirely as long as they are

withdrawn to pay "qualified higher education expenses" to an "eligible educational

institution."[22]

     In the tax context, contributions to a Section 529 savings plan are "treated

as a completed gift to such beneficiary" and not as a future interest in property,

which means that funding such a plan qualifies for the federal gift tax annual

exclusion.  See 26 U.S.C. § 529(c).  Even though the tax code regards the

contributions as a completed gift, the statute provides that the account owner, not

the beneficiary, has total control over the account assets, a fact which some fear

undermines the entire purpose.[23]  Perhaps in part because the account owner

retains so much control over the deposited funds, college savings plans have

proven quite popular.  Wisconsin, like every other state, enacted legislation to

permit the creation of 529 accounts.  Wis Stat. § 14.64(1)(a) specifies that the

---

[21] For purposes of this decision, further references to "529 plans" will, unless otherwise
noted, mean savings accounts rather than prepaid tuition accounts.

[22] Earnings withdrawn for other purposes are subject to income tax and a 10% penalty.

[23] See Adam Winger, "Pick on Someone Your Own Size: Exposing the Account Owner's
Silent Assault on Section 529 Savings Accounts," 35 ACTEC J. 277, 278 (Winter 2009) ("It is
inconsistent with general tax transfer concepts that a contributor enjoy the tax benefits of a
completed gift while retaining sole control over the account assets.  Furthermore, the [account
owner's] unbridled ability to both rename the beneficiary and withdraw funds frustrates Section
529's intent, placing the [beneficiary's] education at risk.").

"account owner" is the person who establishes the account.  Account owners are

authorized to contribute to an account, select beneficiaries, change beneficiaries,

transfer the funds to another account, designate someone else to receive the

funds, or even disburse the funds to themselves.  <u>See</u> § 14.64(3).  The Wisconsin

College Savings Program Board (the entity statutorily charged with administering

the program which handles college savings accounts) outlines the ownership of

contributions and earnings as follows:

> Although contributions to an account can be made by anyone, the
> account owner retains ownership and control of all contributions as
> well as all earnings credited to the account up to the date they are
> directed for disbursement.  *A designated beneficiary or contributor who
> is not the account owner has no control over any of the account assets.*

<u>See</u> EdVest College Savings Plan Program Description and Participation

Agreement published by the Wisconsin College Savings Program Board (dated

July 16, 2010) at 8 (emphasis added).[24]

As the trustee argues and the debtor acknowledges, funds deposited into a

college savings fund can be withdrawn by the account owner at any time and for

any reason.[25]  The EdVest agreement indicates that "[a]n account owner may

---

[24] <u>See</u> http://a584.g.akamai.net/f/584/1326/1d/www.wellsfargoadvantage
funds.com/pdf/529/edvest/program_description.pdf (last accessed December 28, 2010).  The
Wisconsin College Savings Program also offers another plan, the "tomorrow's scholar" college
savings plan.  The participation agreement for that plan contains similar language regarding
account ownership.  <u>See</u> tomorrow's scholar college savings plan Program Description and
Participation Agreement (dated July 16, 2010) at 7, found at http://www.wellsfargoadvantage
funds.com/pdf/529/ts/program_description_new.pdf (last accessed December 28, 2010).

[25] There is an argument that funds invested in the EdVest program are held in trust.
<u>See</u> Robert A. Pasch, 12 Wis. Prac., Wis Collection Law § 15.3 (2d ed.) at ¶ 13.  However,
in the typical case account owners - such as Mr. Bronk - have no fiduciary duties whatsoever to
the beneficiaries of the accounts.  Unlike a trust, with 529 accounts there is no surrender of
dominion or control of the funds.  <u>See</u> Winger, 35 ACTEC J. at 281 (the account owner is in "an
(continued...)

make withdrawals from his or her account or terminate his or her participation at

any time." Participation Agreement at 14. In fact, the debtor's brief notes the

possibility that Mr. Bronk will "require these assets to provide for his own care and

the beneficiaries will not be able to collect." Debtor's Trial Brief at 7. The debtor's

retention of control over the funds is undoubtedly one of the reasons the trustee

challenged the debtor's discharge under § 727(a)(2). However, this alone does not

preclude the exemption claim, as debtors retain control over many of the assets

subject to exemption under Wisconsin law, such as a homestead, a vehicle, or

money in a "depository account." The real question is whether Mr. Bronk's

"ownership" of the account qualifies for exemption.

Both parties argue that the statute's plain language compels the result they

propose. As is often the case, however, there is logical support for both

interpretations. Each cites to a competing rule of statutory construction – the

debtor to the idea that exemption laws are to be liberally construed in favor of the

debtor, and the trustee to the notion that statutes should be construed in such a

manner as to avoid rendering a portion meaningless. As this Court has said on

other occasions, the state legislature has broad discretion in implementing its

constitutional prerogative to provide exemptions to debtors. See In re Bruski, 226

---

[25](...continued)
even better position than the settlor of a revocable trust because, while she retains complete
control over the account, she is assigned none of the accompanying legal duties"). In the
bankruptcy context, courts have recognized that funds placed in 529 accounts remain property
of the bankruptcy estate and do not constitute a spendthrift or other form of trust. See Addison,
540 F.3d at 819-20 (in rejecting the contention that 529 accounts were the property of the
beneficiaries, the Court concluded that the debtor retained "a legal and equitable interest in the
Section 529 accounts"); In re Bourguignon, 416 B.R. 745, 750 (Bankr. D. Idaho 2009) (529
accounts did not constitute a spendthrift trust; debtors had "a legal interest in the College
Account as of the commencement of the case, and it is property of the estate").

B.R. 422, 425 (Bankr. W.D. Wis. 1998) ("[I]f Wisconsin chooses to grant an

exemption . . . it is not the Court's place to second-guess").  Wisconsin courts have

liberally construed exemption statutes in favor of the debtor and the Wisconsin

Supreme Court has stated:

> It is well settled that exemption laws must have a liberal construction,
> within the limits contemplated by the legislature, so as to secure their
> full benefit to the debtor, in order to advance the humane purpose of
> preserving to the unfortunate or improvident debtor and his family the
> means of obtaining a livelihood and thus prevent him from becoming a
> charge upon the public.

Opitz v. Brawley, 10 Wis. 2d 93, 95-96, 102 N.W.2d 117, 119 (Wis. 1960) (citing

Julius v. Druckrey, 214 Wis. 643, 649, 254 N.W. 358, 361 (Wis. 1934)).

At the same time, a liberal construction of authorized exemptions does not

alter the fact that in the absence of a constitutional or statutory provision which

provides otherwise, *all* of the property of a debtor may be subject to the payment of

his debts.  See Northwest Bank & Trust Co. v. Minor, 275 Wis. 516, 82 N.W.2d

323, 324 (Wis. 1957); In re Geise, 992 F.2d 651, 656 (7th Cir. 1993).  As the

Wisconsin Supreme Court observed in Minor, "The right of a debtor to hold his

property free from the claims of creditors is not a common-law right but a right

created by constitutions and statutes." 82 N.W.2d at 324.  As such, the generous

interpretive latitude toward exemption laws does not permit a plain disregard of the

legislative mandate by extending exemptions to beyond what is embraced in the

statute.  Id.; see also Schwanz v. Teper, 66 Wis. 2d 157, 164, 223 N.W.2d 896,

900 (Wis. 1974) ("While it is true that the . . .  exemption statute is to be liberally

construed, the principles of liberal construction cannot be employed to write

exemptions into the statutes.").

Likewise, if a statute is "capable of being understood by reasonably well-informed persons in two or more senses," it is ambiguous and a court may consult extrinsic sources, such as legislative history, to reach an interpretive conclusion. County of Dane v. Labor & Indus. Review Comm'n, 2009 WI 9, 315 Wis. 2d 293, 310, 759 N.W.2d 571 (2009).  The purpose of statutory construction is to determine what a statute means so that it may be given its full, proper, and intended effect.  State v. Quintana, 2008 WI 33, 308 Wis. 2d 615, 627, 748 N.W.2d 447 (2008).  The context and structure of a statute are important to its meaning. Id.  Consequently, statutory language is interpreted "in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." Id. (citing State ex rel. Kalal v. Circuit Court for Dane County (In re Criminal Complaint), 2004 WI 58, 271 Wis. 2d 633, 663, 681 N.W.2d 110 (2004)).  Further, statutory language is read to "give reasonable effect to every word, in order to avoid surplusage."  Id.

Based on all of this, the Court finds it cannot agree with the debtor that allowance of the exemption is required by the "plain language" of Wis. Stat. § 815.18(3)(p).  That subsection was added to the Wisconsin exemptions at the same time that the legislature enacted Wis. Stat. § 14.64(7)(a).  The two are certainly "closely-related statutes" and must be construed in relation to one another in order to ascertain the legislative intent.  The legislature authorized the Wisconsin college savings program in 2000 as part of 1999 Wis. Act 44 relating to "College Tuition and Expenses and College Savings Programs."  In addition to creating Wis.

27

Stat. § 14.64 and adding Wis. Stat. § 815.18(3)(p), the act also modified and

amended Wis. Stat. § 14.63, the section that relates to prepaid tuition plans.

Intriguingly, one of the provisions amended was Wis. Stat. § 14.63(8), which now

reads as follows:

> *Moneys deposited in the tuition trust fund* and a beneficiary's right to the
> payment of tuition, fees and the costs described in sub. (5)(a) under
> this section are not subject to garnishment, attachment, execution or
> any other process of law. [Emphasis added]

The difference between this section and Wis. Stat. § 14.64(7)(a) seems

minor at first glance, but the legislature appears to have made a crucial distinction

between the "money deposited" and a "beneficiary's right" to the use of those

funds.  In the context of a prepaid tuition plan, both the "money deposited" *and* the

beneficiary's right to the money are exempt from garnishment, attachment, and the

like.  For college savings plans, however, the Wisconsin legislature only provided

that the "beneficiary's right to qualified withdrawals" was exempt.  Given that these

two provisions – as well as the subsections of Wis. Stat. § 815.18(3) which

authorize exemptions of tuition units purchased "under" § 14.63 and interests in

college savings accounts "under" § 14.64 – were enacted at the same time, there

must have been a reason for the distinction.[26]

It must be remembered that these accounts are property of Mr. Bronk's

bankruptcy estate.  Under 11 U.S.C. § 541(a)(1), the filing of a bankruptcy petition

creates a bankruptcy estate that includes "all legal or equitable interests of the

debtor in property as of the commencement of the case."  The scope of this

---

[26] Unfortunately, there is very little legislative history or analysis on this point.  <u>See</u> Wi. B.
An., 1999 Reg. Sess. A.B. 654.

provision is broad and all encompassing.  See Chappel v. Proctor (In re Chappel), 189 B.R. 489 (B.A.P. 9th Cir. 1995).  The intent of the statute is to include *all* property rights of the debtor.  Movitz v. Palmer (In re Palmer), 167 B.R. 579 (Bankr. D. Ariz. 1994).  The absolute control Mr. Bronk has over these accounts – i.e., his continued "ownership" of the funds – constitutes a "legal or equitable interest" in property.  See Addison, 540 F.3d at 819-20; Bourguignon, 416 B.R. at 751; Rice v. Johnson (In re Johnson), 371 B.R. 380 (Bankr. E.D. Ark. 2007) (prepaid school tuition that was fully refundable constituted property of the estate).[27]  Property of the estate is subject to the control of the bankruptcy trustee unless it is excluded from the estate under § 541 or exempt under relevant law.[28]

---

[27] The "ownership" of the funds might be impacted if a debtor utilized a trust or a custodial account under a state's Uniform Gifts to Minors Act or a Uniform Transfers to Minors Act to fund a college savings account.  See Bourguignon, 416 B.R. at 750 n.7 (noting "significant" differences between normal 529 accounts and a Uniform Gifts to Minors Act trust account); In re Quakenbush, 339 B.R. 845, 852-53 (Bankr. S.D.N.Y. 2006) (debtor, as beneficiary who had reached age of majority, was the legal and equitable owner of an educational account under New York's Uniform Gifts to Minors Act); see also Susan T. Bart, "The Best of Both Worlds: Using a Trust to Make Your 529 Savings Accounts Rock," 34 ACTEC J. 106, 107 (Winter 2008) ("Thus the best of both worlds is to have an income tax free investment within the restraints of a trust that can explicitly express the grantor's intent and impose fiduciary duties on the trustee to follow the terms of the trust.").  A 529 account owned by an irrevocable trust "may also protect the funds from the creditors of the individual who would otherwise be the account owner." Id. at 108.  In that regard, the EdVest agreement notes that UGMA/UTMA custodial accounts are subject to additional restrictions, such as the inability to change the beneficiary or the account owner except as permitted under applicable UGMA/UTMA law.  EdVest Participation Agreement at 9.  The facts of this case do not require the Court to consider whether such a scenario would alter the outcome.

[28] In Przybylski, the court suggested that the creation of EdVest accounts might also be pursued as fraudulent transfers.  340 B.R. at 632.  However, a debtor's conversion of a non-exempt asset into an exempt asset "is avoidable, if at all, only on an actual fraud theory." Barber v. Dunbar (In re Dunbar), 313 B.R. 430, 439 (Bankr. C.D. Ill. 2004).  Here, the Court has already determined that there was no actual fraud.  That finding does not resolve whether the transferred property is in fact exempt.  If the accounts are not exempt, the transfers do not need to be avoided because the accounts are still property of the estate.  See Bourguignon, 416 B.R. at 750 n.7 (debtors, not their children, were the owners of a 529 account).

In this regard, § 541(b)(6) was added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  It provides that property of the estate does not include:

> [F]unds used to purchase a tuition credit or certificate or contributed to an account in accordance with section 529(b)(1)(A) of the Internal Revenue Code of 1986 under a qualified State tuition program (as defined in section 529(b)(1) of such Code) not later than 365 days before the date of the filing of the petition in a case under this title, but–
>
> (A) only if the designated beneficiary of the amounts paid or contributed to such tuition program was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were paid or contributed;
>
> (B) with respect to the aggregate amount paid or contributed to such program having the same designated beneficiary, only so much of such amount as does not exceed the total contributions permitted under section 529(b)(7) of such Code with respect to such beneficiary . . .; and
>
> (C) in the case of funds paid or contributed to such program having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $5,475[.]

As the court noted in Bourguignon, the statute provides an exclusion from property of the estate for 529 accounts on a "sliding scale."  416 B.R. at 752.  Relevant to this case is what is essentially the bottom end of the scale:  any contributions made within the year prior to bankruptcy are not excluded from property of the estate.  Id. at 752-73.

This brings the discussion back to the Wisconsin exemption.  Did the Wisconsin legislature intend to permit a broad, unlimited exemption of college savings funds which could be claimed by the account owner as well as the beneficiary?  Or did the legislature specifically intend to restrict this exemption to

30

the beneficiary of such accounts, thus limiting the possibility of abuse by account

owners?  While 529 accounts are creatures of federal law, the enabling legislation

– and the corresponding exemption from the claims of creditors, if such an

exemption exists – is a function of state law.  Notably, even though all 50 states

have passed legislation authorizing college savings accounts, there is no

uniformity regarding exemption of those assets under state law.

In <u>Addison</u>, for example, the debtor sought to claim the accounts as exempt

under Minnesota law.  The court noted that there was no Minnesota exemption for

college savings accounts, other than a provision in the enabling statute which

provided that "[p]lan assets are not subject to claims by creditors of the state."  The

court recognized that this provision did not exempt the accounts from all creditors,

which meant that the funds were found to be non-exempt property of the debtor's

bankruptcy estate.  540 F.3d at 820; <u>see also</u> <u>In re Sanchez</u>, No. 05-48721, 2006

WL 395225, at *1 (Bankr. D. Mass. 2006) (indicating that Massachusetts does not

offer an exemption for college savings plans).  In <u>Bourguignon</u>, the debtors could

not claim an exemption because they were Idaho residents and the plan in

question had been created under New Mexico law; the Idaho exemption only

protected funds placed into the state's own college savings program.  416 B.R. at

749.  The court observed that "[e]xemptions from creditor collection activities may

be another residency-based benefit" of such plans.  <u>Id.</u> at 749 n.6; <u>see also</u> <u>In re</u>

<u>McFarland</u>, No. 04-01623, 2004 WL 4960367, at *2 (Bankr. D. Idaho 2004)

(trustee's request for turnover of Idaho college savings plans was denied under

state exemption).

A brief comparison of statutory language illustrates the variety of differences even among those states that do offer an exemption.  For example, the Virginia provisions indicate that "money in the Plan shall be exempt from creditor process and shall not be liable to attachment, garnishment, or other process . . . to pay any debt or liability of any purchaser, contributor, or beneficiary."  See Va. Code Ann. § 23-38.81(E) (West 2010).  In Nevada, Section 529 plans are covered by an exemption for "[m]oney, not to exceed $500,000 in present value" in "a trust forming part of a qualified tuition program . . . unless the money is deposited after the entry of a judgment against the purchaser or account owner or the money will not be used by any beneficiary to attend a college or university."  See Nev. Rev. Stat. § 21.090(r) (2009).

In New York, monies in a 529 account are "one hundred percent" exempt if the account is established in connection with a scholarship program or the judgment debtor "is the account owner and designated beneficiary of such account and is a minor"; otherwise, the exemption is limited to $10,000.00.  See N.Y. C.P.L.R. § 5205(j) (McKinney 2009).  New Jersey law provides that "moneys paid into" a 529 account are exempt from all claims of creditors "of the contributor or the designated beneficiary."  See N.J. Stat. Ann. § 18A:71B-41.1 (2010).  South Dakota, meanwhile, provides that "any amount in or credited to any account" is exempt and not considered an asset or property of the account owner, contributor, or designated beneficiary, but that any funds "contributed within one year prior to the account owner or contributor filing a [bankruptcy] petition" are not exempt.  See S.D. Codified Laws § 13-63-20 (2010).

32

For a number of years, the Louisiana exemption found in La. Rev. Stat. Ann. § 17:3096G provided that "the right of a beneficiary to the assets of an education savings account shall not be subject to" execution by creditors.  In June of 2010, however, the statute was amended to also provide that "monies paid into or out of the assets and the income of any validly existing . . . [529 account] shall not be liable to attachment, levy, garnishment, or legal process in the state in favor of any creditor of or claimant against any program participant, owner, or contributor, or program."  See La. Rev. Stat. Ann. § 17:3096G (2010).  The original version of the Louisiana statute was linguistically similar to Wis. Stat. § 14.64(7)(a).  Unlike many of the other state statutes, the Wisconsin statute also does not provide that the money in the account is exempt; it simply provides that the *beneficiary's right to withdrawals* is exempt.  While the Louisiana legislature's recent decision to broaden its exemption is not determinative, it is nonetheless illustrative of the fact that it would have been quite easy for the Wisconsin legislature to clearly provide a broad exemption for college savings plans.  Indeed, the legislature appears to have done exactly that with prepaid tuition plans under Wis. Stat. § 14.63(8).

It is certainly not inconceivable that the Wisconsin legislature intended to create an unlimited exemption for college savings accounts and that the "account owner" would be entitled to claim that exemption.  But as the cited authorities indicate, there are a number of states which have opted not to protect these accounts at all, while others have added various protections to deter possible abuse.  Consequently, it is also possible that the legislature only wished to extend protection to the beneficiary.  Construing the relevant statutes together, in context,

as the Wisconsin Supreme Court has indicated should be done, leads to the

conclusion that only the "beneficiary's right" to qualified withdrawals from a college

savings account under § 14.64 are exempt under § 815.18(3)(p).[29]  Any other

result would ignore the distinctions the legislature made between the "monies

deposited" and the "beneficiary's right" to withdrawals found in §§ 14.63(8) and

14.64(7), and would also render both of those sections superfluous.  As such, Mr.

Bronk is not entitled to claim the accounts as exempt.  Since the accounts are non-

exempt property of the estate, the trustee is entitled to the turnover of the funds so

that they may be distributed to creditors.

### III.  Exemption of Annuity

The debtor also seeks to exempt the $42,000.00 annuity created on the eve

of the bankruptcy filing.  In his schedules, the debtor asserted that the annuity was

exempt under Wis Stat. § 815.18(3)(j), which provides an exemption for:

> Assets held or amounts payable under any retirement, pension,
> disability, death benefit, stock bonus, profit sharing plan, annuity,
> individual retirement account, individual retirement annuity, Keogh,
> 401-K or similar plan or contract providing benefits by reason of age,
> illness, disability, death or length of service and payments made to the
> debtor therefrom.

The trustee, however, argues that the annuity is not exempt under this provision

and must instead be subject to the limitations of § 815.18(3)(f), which provides an

exemption for "life insurance and annuities."  Under this subsection, "any

─────────────────────

[29] It is also worth noting that the EdVest Participation Agreement makes no mention of a broad state exemption, and instead merely observes that "[u]nder Wisconsin law, a designated beneficiary's right to qualified withdrawals from the Program is not subject to garnishment, attachment, execution, or other process of law."  See Participation Agreement at 27.  While not itself determinative, this reference to Wis. Stat. § 14.64(7), rather than Wis. Stat. § 815.18(3)(p), further illustrates that the two sections should be construed together.

unmatured life insurance or annuity contract owned by the debtor and insuring the

debtor," together with the "debtor's aggregate interest, not to exceed $150,000 in

value" in accrued dividends, interest, or loan value of those insurance or annuity

contracts, are exempt.  If, however, the annuity contract was issued "less than 24

months before" the date the exemption is claimed, the exemption amount is limited

to $4,000.00.

In In re Bruski, 226 B.R. 422 (Bankr. W.D. Wis. 1998), this Court concluded

that § 815.18(3)(j) permitted the debtors to claim an exemption for an annuity

purchased shortly before the bankruptcy filing with funds the debtors obtained by

borrowing against the non-exempt equity in other assets.  Likewise, in Bogue, the

court held that an annuity the debtors purchased on the eve of bankruptcy was

nonetheless exempt under that section.  The trustee had argued that the annuities

did not provide benefits "by reason of age, illness, disability, death, or length of

service."  The Bogue court found that the phrase "by reason of" should be afforded

a broad interpretation – namely, an interpretation in which the key was whether the

annuity was purchased "because of" one of the specified reasons, rather than an

interpretation in which the phrase meant that the annuities were only distributed

upon certain events (age, illness, death).  Under this expansive interpretation, the

annuities could be granted an exemption.  240 B.R. at 749.

Notably, § 815.18(3)(f) was modified by the legislature in 2003.  The

legislature added § 815.18(2)(am), which defines an annuity as "a series of

payments payable during the life of the annuitant or during a specific period."  The

legislature also added the language relied upon by the trustee.  But the legislature

35

did not alter the specific language of § 815.18(3)(j) relied upon in both <u>Bruski</u> and

<u>Bogue</u>.  Thus the question before the Court:  which provision is applicable to Mr.

Bronk's annuity?  Clearly, the annuity was issued less than 24 months before Mr.

Bronk claimed it as exempt.  But § 815.18(3)(f) also recognizes that some

annuities can be claimed as exempt under § 815.18(3)(j), and provides an

exception for the annuities that might be covered elsewhere (§ 815.18(3)(f)(2)

begins, "Except as provided in subd. 3 and par. (j) . . . .").  The answer to this

dispute appears to be controlled by whether Mr. Bronk's annuity is one which

"provides benefits by reason of age, illness, disability, death or length of service,"

so that it falls within the exemption authorized by § 815.18(3)(j).  Otherwise, it

would be subject to the limitations found in § 815.18(3)(f).

     In his brief, the trustee offered legislative analysis of the amendments by the

Legislative Reference Bureau.  The analysis points out that at the time of the

amendments, the exemption laws did not "address exemptions from creditor claims

for an unmatured annuity that is owned by the debtor and that insures the debtor,

his or her dependent, or a person on whom the debtor is dependent."  <u>See</u>

Wisconsin Bill Analysis, 2003 Reg. Sess. S.B. 504.  Such annuities (as well as

"any accrued dividends, interest, or loan values of such annuity contracts") are now

exempt.  This analysis reflects that the legislature believed it was curing a defect in

the current law, but only insofar as current law did not *protect* certain annuities from

exemption.[30]  There is no indication that the revisions to the statute were intended

---

[30] Indeed, the Wisconsin Senate Bill Memo on the 2003 legislation indicates that it was designed for "annuities not covered under s. 815.18(3)(j)."  Wisconsin Senate Bill Memo, 2003
(continued...)

36

to close a loophole or to preclude debtors from utilizing the exemptions previously

available under Wis. Stat. § 815.18(3)(j).  As noted in Wis. Stat. § 815.18(1), the

exemption provisions are to be construed to secure their "full benefit" to debtors.

There is no indication that the legislature intended to overturn the prior

interpretation of § 815.18(3)(j) as concerns annuities but rather envisioned that it

was providing an additional exemption for certain "unmatured" annuities which

might not be subject to the additional requirements of the existing provisions.  The

parties have not supplied the Court with much information about the nature of Mr.

Bronk's annuity, but it appears to sufficiently qualify for exemption under

§ 815.18(3)(j) and as such will be allowed.

   An order and judgment shall be entered consistent with this decision.

   Dated:  January 7, 2011

          BY THE COURT:

          /s/ Thomas S. Utschig

          Hon. Thomas S. Utschig
          U.S. Bankruptcy Judge

---

[30](...continued)
Reg. Sess. S.B. 504 (May 11, 2004).